DA 06-0624

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 114

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

JEREMIAH C. GREEN,

       Defendant and Appellant.

APPEAL FROM:   District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC-05-21
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

         Cathleen O. Sohlberg, Office of Public Defender; Missoula, Montana

      For Appellee:

         Hon. Steve Bullock, Montana Attorney General; John A. Paulson,
Assistant Attorney General; Helena, Montana

         Mitchell A. Young, Lake County Attorney; Polson, Montana

                 Submitted on Briefs: November 21, 2007

                         Decided: April 7, 2009

Filed:

        _____
                  Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Appellant Jeremiah C. Green was convicted of two counts of deliberate homicide by accountability, and one count of tampering with evidence after a jury trial in the Twentieth Judicial District Court, Lake County.  Green appeals the District Court's judgment and commitment.  We affirm.

¶2     We address the following issues on appeal:

¶3     1.  Did Green's trial counsel render ineffective assistance by failing to request that the jury be instructed to view accomplice testimony with distrust?

¶4     2.  Did the District Court err by admitting evidence of Green's prior statement that he would like to kill the victim?

¶5     3.  Did the District Court abuse its discretion by overruling Green's objection to the prosecutor's offering a personal opinion on the credibility of a witness during closing argument?

### FACTUAL AND PROCEDURAL BACKGROUND

¶6     In the early morning hours of February 3, 2005, Troy McDonald shot and killed Gerald Sirucek and Catherine Madplume.  Testimony elicited at Green's trial indicated that the previous day, Gerald Gardipee was staying at Green's father's house in rural Ronan when Green showed up in his jeep with Sirucek, Madplume, and Madplume's brother.  They hung around for awhile drinking beer and shooting a .22 caliber pistol Green had with him, having stolen it from his cousin several weeks before.  When the beer ran out in the early afternoon, the group left and returned to Ronan for more beer,

2

dropping off Madplume's brother and picking up McDonald. They returned to the house and drank for several hours more, at which point Green, Sirucek and Gardipee drove back to Ronan for more beer. After returning to the house and drinking that 18-pack, Gardipee, Sirucek, and McDonald left again to get another 24-pack of beer. Green stayed behind at the house with Madplume.

¶7 According to testimony from Gardipee, when the three men returned to the house with more beer, Sirucek remained in the jeep, passed out drunk. Gardipee testified that the door to the house was locked when they arrived, but that Green, wrapped in a sheet, eventually opened the door before returning to the back bedroom with Madplume. Gardipee then sat in the living room drinking beer alone for a couple of hours until he heard gunshots outside the house. Gardipee testified that when he stepped out of the house, he saw McDonald standing near the jeep, holding Green's pistol. McDonald had shot Sirucek nine times. Gardipee testified at trial that he then went back inside the house to tell Green and Madplume what he had seen. However, in contrast to his trial testimony, Gardipee told police shortly after his arrest that Green had been standing outside with McDonald, holding the gun, when Gardipee went outside. Regardless, McDonald then asked Gardipee to help him move Sirucek's body. The men lifted it out of the jeep and placed it behind a trailer home behind the house. Gardipee then returned to the house only to hear more gunshots from outside the house a few minutes later. Gardipee testified that he then passed out drunk, waking up the next morning to find Sirucek and Madplume's bodies lying outside on the ground near the trailer.

3

¶8    McDonald testified at Green's trial, admitting that he shot both Sirucek and Madplume. The issue at trial was whether Green had aided McDonald in the killings. McDonald's description of the events differed significantly from Gardipee's story. According to McDonald, about two weeks before the shootings Green had told him that Sirucek had money and that he wanted McDonald's help in robbing Sirucek. On the night of the shootings, after McDonald returned from the final beer run, McDonald and Green allegedly discussed a plan in which McDonald would kill Sirucek and Green would kill Madplume. Green retrieved the gun from his jeep, opened the back door, and handed the gun to McDonald. McDonald testified that, with Green beside him, McDonald shot Sirucek nine times as he lay passed out in the back of Green's jeep. Green then stabbed Sirucek several times in the throat to make sure he was dead, then took Sirucek's wallet and took the gun from McDonald. The State Medical Examiner testified that the knife marks were not stab wounds and did not cause or contribute to Sirucek's death.

¶9    McDonald further testified that he and Green returned to the house after shooting Sirucek, at which time Madplume started asking questions about Sirucek's whereabouts. McDonald and Green once again exited the house and developed a plan to lure Madplume into the trailer behind the house to kill her, eliminating her as a potential witness to their previous murder that evening. Green gave the gun back to McDonald and allegedly threatened to kill McDonald if he backed out. McDonald then shot Madplume several times in the back of the head as she looked for Sirucek in the trailer.

4

McDonald and Green returned to the house, at which time Gardipee allegedly helped the men move Sirucek's body from the jeep to behind the trailer. They also removed the rear seat from Green's jeep and left it by the trailer.

¶10 At about 6:30 a.m., Green left for Ronan to clean out his jeep while the other two men stayed behind to sleep, agreeing to deal with the bodies later. Green drove to his Uncle Roy's house, then to his Aunt Betty's. After Green gave his aunt a cursory explanation of what happened, she took him to the Tribal Law and Order office to speak with a tribal officer. On the way, Green admitted making the knife marks in Sirucek's throat, but claimed McDonald had forced him to do so while pointing a gun at his head. Green met with Tribal Officer Ben Asencio and told him that two people had been killed at his father's house, and that one of them was shot in the back of Green's jeep. Officer Asencio contacted the Lake County Sherriff's Office. Green retrieved the clothes he was wearing from his Aunt Betty's house and consented to a blood draw, search of his jeep, and search of his father's residence. Upon arriving at the house, police saw the two bodies behind the trailer and found McDonald and Gardipee inside the house. Both were arrested without incident, and both subsequently entered plea agreements with the State prior to Green's trial, agreeing to testify against Green. Gardipee received a ten-year suspended sentence for the offense of tampering with the evidence. McDonald was sentenced to the Department of Public Health and Human Services after the parties stipulated that he was developmentally disabled and was unable to conform his behavior to the requirements of the law. Green rejected the plea agreement offered by the State,

5

and chose to go to trial on the count of tampering with the evidence and both counts of deliberate homicide by accountability.

¶11 Green's trial began on May 8, 2006, and continued for four days. In addition to the testimony of McDonald and Gardipee, Michael Pierce testified that he lived with Green and Green's father for a period of time in 2000 and 2001, approximately four years prior to the shootings. Pierce testified that during the time he was living with Green, Green made threats against Sirucek and solicited Pierce to help beat up Sirucek, though the two never did. Green also told Pierce that he would kill Sirucek someday if he had the chance. Shortly thereafter Pierce left Montana. The District Court admitted this testimony over defense counsel's objection.

¶12 The jury found Green guilty of the two deliberate homicide charges and the tampering with evidence charge. The District Court sentenced Green to two consecutive life sentences on the two deliberate homicide convictions, and to a consecutive term of ten years on the tampering with evidence conviction. Green's sentences give him no opportunity for parole.

¶13 Green appeals. Additional facts will be discussed herein as necessary.

**STANDARDS OF REVIEW**

¶14 Claims of ineffective assistance of counsel present mixed questions of law and fact that we review de novo. *State v. St. Germain*, 2007 MT 28, ¶ 14, 336 Mont. 17, 153 P.3d 591. We review a district court's ruling regarding the admission of evidence of other crimes, wrongs, or acts for an abuse of discretion. *State v. Buck*, 2006 MT 81, ¶ 71, 331

Mont. 517, 134 P.3d 53; *State v. Aakre*, 2002 MT 101, ¶ 8, 309 Mont. 403, 46 P.3d 648. We also review a district court's ruling on an objection to closing arguments for an abuse of discretion. *State v. Ford*, 278 Mont. 353, 361-62, 926 P.2d 245, 250 (1996).

**DISCUSSION**

¶15 **Did Green's trial counsel render ineffective assistance by failing to request that the jury be instructed to view the accomplice testimony of McDonald with distrust?**

¶16 Both the Montana Constitution and the Sixth Amendment guarantee a person the right to effective assistance of counsel. When reviewing ineffective assistance of counsel claims, this Court applies the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2025 (1984). The burden is on the defendant to show that defense counsel's performance "fell short of the range of competence required of attorneys in criminal cases and that his counsel's deficient performance was prejudicial to his case." *State v. Hendricks*, 2003 MT 223, ¶ 6, 317 Mont. 177, 75 P.3d 1268; *see also Whitlow v. State*, 2008 MT 140, 343 Mont. 90, 183 P.3d 861 (clarifying that the appropriate standard for ineffective assistance claims is not one of neglect or ignorance, but whether counsel's conduct fell below an objective standard of reasonableness). "There is a strong presumption with regard to the first prong of the *Strickland* test that trial counsel's performance was based on sound trial strategy and falls within the broad range of reasonable professional conduct." *State v. Upshaw*, 2006 MT 341, ¶ 32, 335 Mont. 162, 153 P.3d 579 (citing *Hendricks*, ¶ 7); *Whitlow*, ¶ 21.

7

¶17 However, before reaching the merits of an ineffective assistance claim we must first determine whether the claim is properly before the Court on appeal. *Upshaw*, ¶ 33. "The test to determine if an ineffective assistance claim is properly brought on direct appeal is whether the record contains the answer as to 'why' counsel took, or failed to take, action in providing a defense." *Upshaw*, ¶ 33 (citation omitted). If the record does not document the allegations of ineffective assistance of counsel, the claim is not properly raised on appeal, but may be pursued in a petition for postconviction relief. *Hagen v. State*, 1999 MT 8, ¶ 12, 293 Mont. 60, 973 P.2d 233. If a merely "plausible" (but not necessarily "actual") justification exists for counsel's conduct, postconviction proceedings are appropriate and the appeal should be dismissed without prejudice. *Upshaw*, ¶ 35 (citation omitted). "Situations when no justification will exist for counsel's action are 'relatively rare.'" *State v. Herman*, 2008 MT 187, ¶ 16, 343 Mont. 494, 188 P.3d 978 (quoting *State v. Kougl*, 2004 MT 243, ¶ 15, 323 Mont. 6, 97 P.3d 1095).

¶18 Green's ineffective assistance of counsel claim is based on § 26-1-303(4), MCA, which provides that "[t]he jury is to be instructed by the court on all proper occasions that . . . the testimony of a person legally accountable for the acts of the accused ought to be viewed with distrust," known as an "accomplice instruction." Green's trial counsel did not request an accomplice instruction based upon § 26-1-303(4), MCA, that McDonald's and Gardipee's testimony should be viewed with distrust. We have explained "[w]hether a witness for the prosecution is an accomplice is generally a question for the jury, unless the fact is undisputed," *State v. Rose*, 1998 MT 342, ¶ 13, 292 Mont. 350, 972 P.2d 321,

(citation omitted), but here it is undisputed that Green was being prosecuted as McDonald's and Gardipee's accomplice. However, we have recognized that requesting this instruction is not required in all cases. There may be tactical reasons that defense counsel does not want an accomplice instruction given, such as when the instruction would be inconsistent with the defendant's theory in the case. *State v. Johnson*, 257 Mont. 157, 163, 848 P.2d 496, 499 (1993).

¶19 In *Johnson*, the defense theory was that the defendant was not present at the scene of the crime. We held that the accomplice instruction could have been considered inconsistent with that defense and, thus, under those circumstances defense counsel's decision was tactical and did not amount to ineffective assistance. *Johnson*, 257 Mont. at 163, 848 P.2d at 499. In contrast, when determining to reverse in *Rose*, we noted that there was "no indication that counsel made a tactical decision not to request an instruction on accomplice testimony." *Rose*, ¶ 18. The State had acknowledged in *Rose* that such an instruction would have been appropriate. We observed that no plausible explanation existed for failing to request an accomplice instruction under § 26-1-303(4), MCA, when "the accomplice testifies that the accused came up with the idea for the burglary, identified the items to be taken, provided the tools with which to commit the offense, and provided transportation to the scene." *Rose*, ¶ 18.

¶20 Here, one of the two alleged accomplices actually provided favorable testimony for the defense. Although McDonald claimed Green was with him during the shootings, Gardipee testified that Green was in the bedroom when both victims were shot.

9

Considering Gardipee's favorable testimony, Green's counsel may have decided to withhold a "viewed with distrust" instruction in order to prevent the casting of any unwanted doubt upon the testimony of a witness who supported the defense theory that Green had not actively participated in either murder.

¶21 Additionally, Green initially indicated he would rely on the affirmative defense of compulsion. *See* § 45-2-212, MCA. Asserting a compulsion defense could be incompatible with the notion that Green was an "accomplice" in the crimes, and could explain why he did not request the instruction. Potentially inconsistently, however, Green's counsel did request an accomplice-related instruction under § 46-16-213, MCA, requiring McDonald's testimony to be "corroborated by other evidence that in itself . . . tends to connect the defendant with the commission of the offense" in order to convict Green. Once again, there is no indication why defense counsel requested only this accomplice instruction, although Green's counsel could have believed the jury would view this instruction as placing an additional burden on the State to corroborate McDonald's testimony.

¶22 Because "plausible" justifications, discussed above, exist for counsel's conduct, it is not appropriate to address this issue on appeal, where the record does not flush out the factual questions surrounding counsel's actions. *Upshaw*, ¶ 35. Consequently, we dismiss Green's claim of ineffective assistance of counsel without prejudice to raising the claim in postconviction relief proceedings, so the reasons for counsel's failure to request the accomplice instruction can be determined.

10

**¶23 Did the District Court err by admitting evidence of Green's prior statement that he would like to kill the victim?**

¶24 On December 23, 2005, the State filed notice that it intended to introduce evidence that Green stole the .22 caliber pistol used in the homicides, had solicited Pierce to beat up Sirucek, and had stated that he would kill Sirucek someday if he had the opportunity. Defense counsel objected to the introduction of this evidence, specifically asserting that Green's statements were too remote in time to be admissible. Although Green's statements to Pierce were made in 2001, the State responded they were evidence of Green's intent and preparation, and thus were admissible pursuant to M. R. Evid. 404(b). The District Court overruled Green's objection, and Pierce was allowed to testify at trial.

¶25 The admissibility of other crimes, wrongs, or acts is controlled by M. R. Evid. 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

A district court has broad discretion when determining whether other crimes evidence is admissible under M. R. Evid. 404(b). *State v. Ayers*, 2003 MT 114, ¶ 72, 315 Mont. 395, 68 P.3d 768. A court's decision to admit such evidence is guided by the Modified *Just* Rule, which requires four elements be met before the evidence is allowed:

(1) The other crimes, wrongs or acts must be similar.

(2) The other crimes, wrongs or acts must not be remote in time.

11

(3) The evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity with such character; but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(4) Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Ayers*, ¶ 73 (citing *Aakre*, ¶ 9); *State v. Matt*, 249 Mont. 136, 142, 814 P.2d 52, 56 (1991); *State v. Just*, 184 Mont. 262, 602 P.2d 957 (1979) (*overruled on other grounds State v. Swann*, 2007 MT 126, 337 Mont. 326, 160 P.3d 511); M. R. Evid. 404(b). When such evidence is introduced, the trial court must "explain to the jury the purpose of such evidence and shall admonish it to weigh the evidence only for such purposes." *Ayers*, ¶ 77 (citation omitted).

¶26 Green argues that neither the second nor the fourth requirement of the Modified *Just* Rule was satisfied here. According to Green, the four-year gap between his statements and the shooting requires exclusion on remoteness grounds because there is no evidence that he engaged in a continuing course of conduct with respect to his threats. Citing *State v. Hansen*, 187 Mont. 91, 608 P.2d 1083 (1980), Green argues that an event taking place three years prior to the crime charged is too remote unless the acts engaged in constitute a "continuing course of conduct." Under the fourth requirement, Green argues the evidence was "highly prejudicial and clearly violated the historical purposes for the rule[,] which include protecting the presumption of innocence and limiting the trial evidence to the act alleged."

12

¶27 In *Hansen*, we held that evidence of the defendant's prior rape of another woman two-and-a-half years prior should have been excluded because the circumstances of that charge were not sufficiently similar to those of the defendant's current rape charges and were too remote. *Hansen*, 187 Mont. at 98, 608 P.2d at 1087. We also noted that, "[a]lthough a three year interval between a prior act and the charged crime is close to the limit of being too remote, other acts occurring three years prior to the crime have been held admissible when the acts engaged in by the defendant constitutes a continuing course of conduct." *Hansen*, 187 Mont. at 97, 608 P.2d at 1087. Contrary to what Green urges, however, this statement was not intended to create a bright-line rule requiring the exclusion of evidence of all prior acts occurring more than three years prior to the charged crime unless there is evidence of a continuing course of conduct. In *State v. McKnight*, 250 Mont. 457, 463, 820 P.2d 1279, 1283 (1991), for example, we held that a three-year period between incidents was not too remote because the incidents in question were sufficiently similar. "Moreover, we consistently have declined to set arbitrary time limits defining the remoteness factor." *State v. Brogan*, 272 Mont. 156, 167, 900 P.2d 284, 291 (1995).

¶28 In the present case, while there may not be clear evidence that Green engaged in a "continuing course of conduct" between his statements in 2001 and the homicides in 2005, there is no dispute that Green's statement that he would like to kill Sirucek, and the ultimate killing of Sirucek, involve the same parties. More than being merely "similar," the prior act was a threat to carry out the very crime against the identical victim which

13

ultimately occurred. The fact that Green's statements and the charged offenses were separated by a three to four year period is offset by the connected nature of these events. A threat to kill an individual is compelling, specific evidence with respect to charges for the subsequent killing of that same individual. The two events cannot be logically separated merely by the passage of a few years between the threat and the actual act.

¶29 Pierce and Green had a falling out soon after Green made the statements, and Pierce moved to another state shortly thereafter. There is no evidence of further efforts by Green to solicit help to commit an offense against Sirucek until several weeks before the killing, when he stole a gun from his cousin and allegedly realized he could manipulate McDonald into robbing and killing Sirucek with the gun. The fact that Green told Pierce he wanted to kill Sirucek if he had the opportunity, and that Sirucek was indeed killed four years later with a weapon Green had stolen only weeks before, is simply too similar to reject as being too remote under the Modified *Just* Rule. Moreover, the strength in the similarity or connectedness of these facts demonstrates that their probative value was not "substantially outweighed" by the danger of unfair prejudice, under the fourth factor of the Rule. We conclude that the District Court did not abuse its discretion by admitting Green's prior statements to Pierce under M. R. Evid. 404(b).

¶30 Green also argues that the District Court erred by failing to instruct the jury, at the time the other crimes evidence was introduced, as to the purpose of the evidence and how to weigh it. *See Ayers*, ¶ 77. Indeed, the court did not give the jury such an instruction until after the State Medical Examiner had testified and the court had recessed for lunch.

14

At that time, counsel for both parties met in chambers, at which time the State presented the court with its proposed Rule 404(b) jury instruction. The court asked both counsel if they objected to the reading of the instruction at that time, and neither did. While counsel for the State suggested the court tell the jury that the instruction ordinarily would have been read at the time the other crimes evidence was introduced, defense counsel preferred a general statement that "this is the proposed time for me to give you this instruction . . . ." The Court instructed the jury in accordance with defense counsel's request. Because defense counsel did not object to this procedure, this issue has been waived for purposes of appeal. Section 46-20-104(2), MCA.

¶31 **Did the District Court abuse its discretion by overruling Green's objection to the prosecutor's offering a personal opinion on the credibility of a witness during closing argument?**

¶32 During closing argument, the prosecution discussed the fact that Gardipee had first told the investigating officer that he had seen Green standing beside McDonald after Sirucek was shot, but had later testified that Green was with Madplume inside the house when the shooting occurred. The prosecutor stated:

> You heard from a number of witnesses. Only two of them were present and know firsthand what happened. [I'm] going to start with Glen Gardipee. You might wonder why I had Glen testify. Well, I'll tell you why. There's two responses. One, I had some faint hope that being under oath and being in a trial situation and facing some sort of pressure he might actually blurt out the truth. The closest he came was admitting to you that he changed his story in order to remove himself as a witness in this case. Well, I didn't hold out much hope for that one.

Green argues on appeal that this constituted an improper comment on Gardipee's credibility, although Green's trial counsel did not object at the time the statement was

15

made. Rather, when the prosecutor later argued about Green's own credibility, defense counsel objected, stating "it sounds to me like [the prosecutor] is interjecting his own personal opinion as to the credibility of the witnesses and that's the exclusive province of the jury." The District Court overruled the objection, and Green does not appeal the court's decision as it applied to the prosecutor's statements about Green. Instead, Green contends that the objection should have been sustained with respect to the prosecutor's statements about Gardipee. The State responds that Green waived his right to appellate review by failing to contemporaneously object when Gardipee's credibility was challenged, but that even if Green's objection is considered timely, the prosecutor's statements were not improper. We agree.

¶33 During closing argument, a prosecutor may comment on "the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved, to be presented in instructions to the jury . . . ." *State v. Staat*, 251 Mont. 1, 10, 822 P.2d 643, 648 (1991) (quotations omitted). While it is generally improper for the prosecution to offer personal opinions as to the credibility of the accused or the witnesses, *State v. Stringer*, 271 Mont. 367, 380, 897 P.2d 1063, 1071 (1995), "it is proper for a prosecutor to comment on conflicts and contradictions in testimony, as well as to comment on the evidence presented and suggest to the jury inferences which may be drawn therefrom." *State v. Gladue*, 1999 MT 1, ¶ 15, 293 Mont. 1, 972 P.2d 827.

16

¶34 Here, the prosecutor was primarily reminding the jury of the inconsistency between Gardipee's statement to the police after his arrest and his later testimony. In the first instance, Gardipee told investigators that Green had been outside the house with McDonald when Sirucek was shot. Later, Gardipee testified that Green was inside the house with Madplume. The prosecutor was entitled to point out the inconsistencies and to allow the jury to infer that Gardipee changed his story after having time to think about the consequences. The prosecutor was likewise entitled to argue which of the two versions provided by Gardipee was the truth. While that discussion lapped over into "why" the prosecutor had called Gardipee as a witness, a prosecutor is entitled to some latitude in his argument about a witness's credibility. *See State v. Hanson*, 283 Mont. 316, 326, 940 P.2d 1166, 1172 (1997). We conclude the prosecutor's statements do not require reversal.

¶35 Affirmed.

/S/ JIM RICE

We concur:

/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

17

Justice James C. Nelson, dissenting.

¶36   I respectfully dissent from the Court's decision as to Issue 1. I would reverse and remand for a new trial on this issue and, therefore, would not address Issues 2 and 3.

¶37   It is well-settled that proving an ineffective assistance of counsel claim requires the defendant to show (1) that counsel's performance was deficient, i.e., that it fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances, and (2) that counsel's errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. *Whitlow v. State*, 2008 MT 140, ¶¶ 10, 20, 343 Mont. 90, 183 P.3d 861 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). I first address the performance prong of this test.

¶38   The premise of the Court's Opinion is that there may be "plausible" justifications for defense counsel's failure to request the "view with distrust" instruction required by § 26-1-303(4), MCA, and that these supposed justifications should be fleshed out in postconviction proceedings. Opinion, ¶¶ 17, 22. Ordinarily, I would agree with this approach. In the present case, however, the record establishes that Green's counsel rendered constitutionally ineffective assistance of counsel by failing to request the "view with distrust" instruction. Accordingly, under our caselaw, reversal is required.

¶39   Section 26-1-303(4), MCA, states that "[t]he jury is to be instructed by the court on all proper occasions that . . . the testimony of a person legally accountable for the acts of the accused ought to be viewed with distrust" (paragraph break omitted). On one

18

hand, the Court speculates that Green's counsel might not have requested this instruction because it would have been inconsistent with Green's theory in the case, Opinion, ¶ 18, or with his asserted defense of compulsion,[1] Opinion, ¶ 21, or because he did not want to cast doubt on the testimony of a potentially favorable witness, Opinion, ¶ 20. On the other hand, however, the Court acknowledges that counsel did, "[p]otentially inconsistently," request an accomplice-related instruction under § 46-16-213, MCA, which states that a person may not be found guilty of an offense on the testimony of one responsible or legally accountable for the same offense (here, the testimony of McDonald) "unless the testimony is corroborated by other evidence that in itself . . . tends to connect the defendant with the commission of the offense." Opinion, ¶ 21.

¶40 I submit that defense counsel's action is more than just "potentially inconsistent." It is illogical and even "implausible" to assume that counsel wanted the jury to be instructed that McDonald's testimony must be corroborated by other evidence independently connecting Green to the crimes but did not want the jury to view

---

[1] The Court states that Green's compulsion defense "could be incompatible with the notion that Green was an 'accomplice' in the crimes, and could explain why [defense counsel] did not request the ['view with distrust'] instruction." Opinion, ¶ 21. I disagree. As a matter of fact, this defense does *not* explain counsel's action at all, since counsel withdrew the compulsion defense with respect to Counts I and II (the homicide charges) in the midst of settling jury instructions. *See* Reporter's Transcript on Appeal at 12 (May 11, 2006). As a result, the court, the prosecutor, and defense counsel then engaged in further discussion as to how the language of the compulsion instruction should be modified to reflect that it applied only to Count III (the tampering with evidence charge). *See* Transcript at 12-14. Assuming, arguendo, that defense counsel initially did not request the "view with distrust" instruction because it would have been incompatible with Green's compulsion defense, that rationale was mooted once counsel withdrew this defense to Counts I and II. Yet, counsel did not then request the "view with distrust" instruction, which he should have done, as explained below.

McDonald's testimony with distrust in the first place. Rather than having some tactical or even conscious purpose in mind, as the Court surmises, it is more likely that Green's counsel was simply unaware of the requirement in § 26-1-303(4), MCA, and our caselaw, discussed below, that the "view with distrust" instruction must be given where the State's case is grounded on accomplice testimony.[2]

¶41 The District Court's instructions bear this out. First, the jurors were told in Instruction No. 4 that they were "the sole judges of the credibility, that is the believability, of all the witnesses testifying in this case, and of the weight, that is the importance, to be given their testimony." Furthermore, the jurors were told that they were "not bound to decide any fact based upon the testimony of a larger number of witnesses whose testimony does not convince you against the testimony of a smaller number of witnesses (or against a presumption), or other evidence which does convince you." Indeed, the jurors were told that "[t]he evidence presented by one witness whom you believe is sufficient for the proof of any fact in this case." Thus, under Instruction No. 4, if the jurors believed McDonald, his testimony was sufficient to establish Green's guilt of deliberate homicide by accountability.

¶42 Yet, under Instruction No. 17, the jurors were told that

> [a] person may not be found guilty of an offense on the testimony of one
> responsible or legally accountable for the same offense unless the testimony
> is corroborated by other evidence that in itself and without the aid of the

---

[2] The placement of the "view with distrust" instruction in Title 26, as opposed to Title 46, of the MCA may be problematic for some inexperienced criminal defense counsel. That, however, does not absolve counsel from his or her obligation to research and request jury instructions appropriate to the defendant's theory and defense.

testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense.

Thus, under Instruction No. 17, McDonald's testimony was insufficient to establish Green's guilt. It had to be corroborated by other evidence tending to connect Green with the commission of the offense. In short, without the "view with distrust" instruction, the jurors were left with apparently conflicting instructions on whether McDonald's testimony itself was sufficient to prove a fact at issue.

¶43 In this connection, the corroboration instruction presumes that there was an accomplice, while the "view with distrust" instruction requires the jury to view that person's testimony with distrust. It is logical that a jury would consider the accomplice's testimony and view it with distrust *before* even reaching the requirement of corroboration. That is why the accomplice's testimony must be corroborated—because it is to be viewed with distrust by the jury in the first instance and because accomplice testimony (especially where, as here, codefendants cut deals with the State) is simply not reliable. If the jurors, as they are required, first view the accomplice's testimony with distrust and then find that corroborative evidence is lacking or weak, then the State may well be unable to convince the jury of the accused's guilt beyond a reasonable doubt. If the State's case hangs on the credibility of the accomplice, then the State may be unable to convict if the jurors do not find the accomplice's testimony credible.

¶44 Here, McDonald was an accomplice as a matter of law. McDonald and Green were both charged in connection with the Sirucek and Madplume homicides, and we have held that the State's charging one person for the same crime for which the defendant is

tried constitutes an acknowledgement by the State that the person is an accomplice. *State v. Johnson*, 276 Mont. 447, 451-52, 918 P.2d 293, 295-96 (1996). Indeed, Green was charged as McDonald's accomplice. McDonald admitted killing Sirucek and Madplume and testified against Green as part of his plea agreement with the State. The State's case hinged to a great extent on McDonald's testimony.

¶45 In *State v. Rose*, 1998 MT 342, 292 Mont. 350, 972 P.2d 321, on facts similar to those here, we observed that there was "no indication that counsel made a tactical decision not to request an instruction on accomplice testimony." *Rose*, ¶ 18. We concluded that defense counsel had nothing to lose by asking for this instruction, and we reversed, holding that there was no reasonable tactical or strategic reason for failing to provide an instruction on the jury's consideration of an accomplice's testimony when the accomplice testifies that the accused came up with the idea for the crime and provided the tools with which to commit the offense. *Rose*, ¶ 18.

¶46 Likewise, in the case at bar, McDonald testified that Green came up with the idea for killing Sirucek and Madplume and that Green then provided McDonald with the means for doing so (the gun Green stole from his cousin). Gardipee's testimony that Green was in the house at the time of the shootings was of dubious credibility, given his admissions on the witness stand that he had not been honest with the police and that he had given a conflicting account of the incident 12 hours after the shootings. Thus, McDonald's credibility was critical to the State's case, and Green's defense hinged to a great extent on the jury not believing McDonald. Yet, Green's counsel did not request

22

the one instruction that would have required the jury to view McDonald's testimony with distrust. The jury "should have been specifically instructed that it should view the testimony of [McDonald], an accomplice, with distrust." *Rose*, ¶ 19.

¶47 In *State v. Kougl*, 2004 MT 243, 323 Mont. 6, 97 P.3d 1095, we followed our decision in *Rose* and found deficient performance by defense counsel because counsel failed to request the "view with distrust" instruction. *Kougl*, ¶ 21. Kougl had been charged with felony operation of an unlawful clandestine laboratory. As in the instant case, Kougl's accomplices testified against him at trial as part of their plea agreements with the State. *Kougl*, ¶ 7. In closing argument, defense counsel pointed out to the jury that the testimony of the accomplices should be viewed with suspicion because of their criminal conduct and the deals two of them had cut with the State. *Kougl*, ¶ 9. Notwithstanding, defense counsel did not ask for the "view with distrust" instruction under § 26-1-303(4), MCA. *Kougl*, ¶ 9. Consistently, defense counsel also did not request the corroboration instruction pursuant to § 46-16-213, MCA. *Kougl*, ¶ 9.

¶48 On appeal, Kougl raised an ineffective assistance of counsel claim, which we held was properly before us on direct appeal, as opposed to requiring him to raise it in a postconviction proceeding. *Kougl*, ¶ 22. We stated that "[g]enerally, in addressing ineffective assistance of counsel claims, we ask 'why' counsel did or did not perform as alleged and then seek to answer the question by reference to the record." *Kougl*, ¶ 14. We then explained that "[s]ometimes, however, it is unnecessary to ask 'why' in the first instance." *Kougl*, ¶ 15. An example of this "is when counsel is faced with an obligatory,

23

and therefore non-tactical, action. Then the question is not 'why' but 'whether' counsel acted, and if so, if counsel acted adequately." *Kougl*, ¶ 15 (citation omitted). Another example, which is present here, "is the relatively rare situation where there is 'no plausible justification' for what defense counsel did." *Kougl*, ¶ 15. We stated that "[w]hether the reasons for defense counsel's actions are found in the record or not is irrelevant. What matters is that there could not be any legitimate reason for what counsel did." *Kougl*, ¶ 15. We cited *Rose* as falling within this latter example, observing that defense counsel in *Rose* "had nothing to lose in asking for the ['view with distrust'] instruction, and if counsel had asked for the instruction the trial court would have been obligated to grant the request." *Kougl*, ¶ 17.

¶49    As with *Rose*, we observed that there was no reason for Kougl's counsel not to ask for the "view with distrust" instruction, given that the parties had agreed that the "accomplices" were, in fact, accomplices and given that the State's case against Kougl was based largely on the credibility of these witnesses. *Kougl*, ¶ 20. Indeed, we noted that counsel had "nothing to lose" in asking for this instruction, while Kougl, "however, risked losing his liberty." *Kougl*, ¶ 21. We determined that "[b]y failing to ask the court to tell the jurors that the law demands they view the accomplices' testimony with distrust, trial counsel failed to use the law to strike at the heart of the State's case." *Kougl*, ¶ 20. Thus, we concluded that we could rule on the merits of Kougl's ineffective assistance of counsel claim without asking "why" counsel had not requested the instruction. *Kougl*,

24

¶ 22. It was enough that she had not, and we held that her performance was deficient. *Kougl*, ¶ 24.

¶50 These precedents are controlling here. In *Rose*, we held that defense counsel rendered ineffective assistance of counsel by failing to request the "view with distrust" instruction. Rather than referring the case to a postconviction proceeding, we held on direct appeal that Rose's defense was prejudiced. *Rose*, ¶¶ 19-20. Similarly, in *Kougl*, we held that Kougl's ineffective assistance of counsel claim should be decided on direct appeal and that defense counsel rendered ineffective assistance of counsel by failing to request the "view with distrust" instruction. *Kougl*, ¶¶ 22, 24, 27.

¶51 Likewise here, by failing to request the "view with distrust" instruction required by § 26-1-303(4), MCA, defense counsel's conduct fell below an objective standard of reasonableness measured under the prevailing professional norms established by our caselaw. *Whitlow*, ¶ 20. Counsel did not request the instruction although there was no plausible or legitimate justification for this course of action and although he had nothing to lose in asking the District Court to give it. McDonald was an accomplice as a matter of law; he testified against Green; and the State's case against Green was based almost entirely, if not exclusively, on McDonald's credibility as a witness. Therefore, as we determined in *Rose* and *Kougl*, Green's counsel made errors so serious that he was not functioning as the "counsel" guaranteed Green by the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution. *Whitlow*, ¶ 10.

25

¶52 Turning, then, to the prejudice prong of the analysis, we stated in *Rose* that "[t]o support the prejudice element of a claim of ineffective assistance of counsel, a defendant need not demonstrate that he would have been found not guilty had his counsel taken different action"; rather, he "must establish only that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different." *Rose*, ¶ 19 (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). In considering whether counsel's failure to request the "view with distrust" instruction prejudiced Rose's defense, we observed that "the distinction between what the jury was told and what it should have been told is significant." *Rose*, ¶ 19. The jury had been instructed "only in general terms relative to the weight to be given the testimony of witnesses," though it "should have been specifically instructed that it should view the testimony of [the accomplice] with distrust." *Rose*, ¶ 19. We further observed that a "view with distrust" instruction "would have gone to the heart of the defense that [the accomplice] was not telling the truth when he said Rose was involved with him in the burglary." *Rose*, ¶ 19. Having made these observations, we held that counsel's failure to request the instruction was prejudicial to Rose's defense. *Rose*, ¶ 20.

¶53 Similarly, in *Kougl*, we determined that Kougl "established prejudice because the ['view with distrust' and corroboration] instructions would have conveyed to the jurors that the law commanded them to view the State's crucial evidence with distrust such that there is a reasonable probability they would have arrived at a different outcome." *Kougl*, ¶ 26. We noted that it is particularly important that the trial judge instruct the jurors in

26

this regard, as opposed to the jurors hearing the law through argument by counsel. We explained that "what the judge tells the jury necessarily carries the force of law, while what the adversarial counsel tells the jury does not." *Kougl*, ¶ 26. Moreover, written jury instructions may be "read, reread, and reflect[ed] on while in deliberation." *Kougl*, ¶ 26.

¶54 In the present case, the jury was instructed in general terms relative to the weight to be given the testimony of witnesses and was told that "[t]he evidence presented by one witness whom you believe is sufficient for the proof of any fact in this case." The jury was also told, however, that McDonald's testimony had to be corroborated in order to convict Green on the basis of that testimony, without any indication as to why such corroboration was necessary. The missing link was that McDonald's testimony had to be "viewed with distrust" from the outset, which the jury should have been told. Section 26-1-303(4), MCA. A "view with distrust" instruction would have gone to the heart of the defense that McDonald was not telling the truth when he said that Green was involved with him in the shootings. *Rose*, ¶ 19. A "view with distrust" instruction would have conveyed to the jurors that the law commanded them to view the State's crucial evidence with distrust. *Kougl*, ¶ 26. There is a reasonable probability, therefore, that but for counsel's unprofessional errors, the result of Green's trial would have been different. *Rose*, ¶ 19.

¶55 As we held in *Rose* and *Kougl*, therefore, I conclude that defense counsel's failure to request the "view with distrust" instruction prejudiced Green's defense and draws into question the reliability of the result of his trial. There are no substantive differences

27

between the case at bar and the cases we decided in *Rose* and in *Kougl*. We should follow our precedent in this case.

¶56    Accordingly, I would reverse on Issue 1 and remand for a new trial. I respectfully dissent from our failure to do so.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins the Dissent of Justice James C. Nelson.

/S/ PATRICIA COTTER